Daniel Geiser, appearing for Appellant. Sean O'Keefe, appearing for Appellate. Okay, good morning. Mr. Geiser, do you want to reserve part of your 15 minutes for rebuttal? I'd like to reserve three minutes, Your Honor. Three minutes. All right, please go ahead. All right, thank you, Your Honor, and may it please the Court. The Bankruptcy Court committed multiple independent errors that each warrant reversal. First and foremost, liens cannot be subordinated under Section 510B. Let's jump in right there. They can be avoided under 522, and I don't think that you argue in your briefs that secure claims can't be subordinated. Why can't they? Well, Your Honor, again, we're not saying that a secured claim can't be subordinated. We're saying that the associated lien cannot be subordinated. What would it mean to subordinate a secured claim without subordinating the lien? What it would mean, Your Honor, is that a creditor who has a lien and has a secured claim, they can get paid out of the general assets of the estate, and they may prefer to do that, because then they don't have to deal with actually taking back the property and getting relief from the sale of the property itself. It's far more expedient to recover the value of the claim from the estate's assets. That's not how Chapter 7 estates work. You're going to draw a secured creditor, withdraw an objection, objecting to the distribution and telling them to go look to the collateral. Well, Your Honor, I think that's the very point. Under Section 725, we get to collect the—we get to dispose of the lien and recover out of— You get to dispose of the lien? That's not what that says. That's just not what the section says. Your Honor, I'm sorry. As I read Section 725, it says very clearly that before any distribution of property to the estate, which is the sole focus of Section 510, before any distribution, the trustee shall dispose of property in which an entity other than the estate has an interest such as a lien. So a lien has to be disposed of before— No, no, no, no. The property has to be disposed of, and it doesn't say how it has to be disposed of. It certainly doesn't say what you say repeatedly in your briefs, that the property must be turned over to the lien holder. 725 just doesn't say that. Well, Your Honor, what it does say, I think, quite clearly, is that you do need to dispose of property in which an entity other than the estate has an interest. Now, one thing that I think is very important here is that the Bankruptcy Court did not say that the lien here is avoided. The Bankruptcy Court said the opposite, and I think the trustee has conceded as much. The lien is still valid, and if the trustee wants to— Just the priority that's been affected. Why do you get to retain an NREM when the claim is subordinated? Your right to payment, your fundamental right to payment, has been subordinated. Why do you get to prime that through a lien that must necessarily follow the claim? But, Your Honor, the lien itself is an independent— It is an incident of the claim. The lien supports the claim, Your Honor. It follows the claim. If there's no right under the claim, then there's nothing to execute on the lien. But, Your Honor, then what Your Honor, I believe, is saying is that Section 510 is not simply subordinating the claim. In fact, it's invalidating the claim. It's setting it aside. You've just been reprioritized. You've just been taken from up here and pushed down. You've been pushed down underneath the unsecured creditors. You still have that claim. It's just now that it is likely to be a junior, unsecured, secure claim, like many second, thirds, fourths. Your Honor, I think of the practical consequences of that, though. If the lien is still valid, it has to attach to the property. I think that's true. To the extent there is something to attach to, yeah. And to the extent it's valid, and you've ignored Section 506D that says that if a claim is not an allowed, secured claim, the lien is void. And a claim is secured only to the extent that there's value in the collateral for that claim. And if the claim has been subordinated, there's no longer probably any value. And therefore, no allowed, secured claim. Therefore, a void lien. Your Honor, I think that's putting the cart before the horse, though. Because the first question is, when you do have that protected lien, and it hasn't been avoided, and the trustee here has given up the claims and attempting to invalidate the lien. That's not attempting to invalidate the lien. Again, as with 725, that's just not the case. Judge Smith was clear that the lien exists. It is just riding along with the claim, which does not get any right to payment until all the unsecured creditors are paid. But, Your Honor, the lien attaches to specific assets. In support of the claim. Your Honor, but the two are distinct. No, they're not. There's a California statute directly on point. It's incident to the claim. There's no such thing as a lien without a right to something, to payment. And if your right to payment is gone, the lien is no good. How can you have a mortgage without a right to get paid? Well, Your Honor, though, you still have the property interest itself. And I think that if you just look to the language of 510B, I think it's crystal clear that what Congress was thinking about was not that you're supporting and aiding the lien. Can I ask you a slightly different question? And I apologize if my colleagues want to follow up. If 510C clearly, more clearly, perhaps, subordinates liens than 510B, what was Congress thinking? I mean, why would it be prohibited for the same result to occur under 510B? Is there a policy reason there or some other logical reason why it wouldn't be the same result under 510B? I think so, Your Honor. And I think there are two critical points about the difference of 510B and 510B. I mean, putting aside your arguments about liens existing independently, I think that's another issue, okay? But just tell me, what would Congress have been thinking about if they tried to do that? I think what they would have been thinking, and it's expressed on the plain text of the statute, is that when you're dealing with equitable subordination, there might be an additional reason to take away a protected property interest. But when you're not dealing with equitable subordination, once a creditor has gone through the effort and they've obtained a vested property interest under state law, they have different degrees of finality and repose in that interest. They have a different vested expectation. You could argue it's exactly the opposite. We're going to do a whole bunch of fact-finding under 510C to determine, maybe quite difficultly, that your client did bad things and they're subordinated. 510B is easy. If this arises from a securities claim, it's not really a claim. It's exactly the opposite, in my view. Your Honor, I think that if Congress actually thought that a lien was subordinated under Section 510B, then it would have mentioned claims and liens in Section 510B instead of drawing a stark distinction between those two concepts in 510C1 and 510C2. I'm not getting the stark distinction at all. Thank you for trying to answer my question. Let me put it to you a little differently. I think what 510B says, and I think you would agree, is that an equity holder can't step up to an unsecured claim. You can't convert equity to an unsecured claim. But what your argument is that you can convert equity into a secured claim. You can take two steps up, but you can't take one step up. And I think, why would that be the case? Why would Congress want to do that? Your Honor, Congress would want to do that because Congress has ample opportunities and tools in the code for setting aside liens that shouldn't exist. But once a creditor actually goes through and they survive all the many different provisions for setting aside preferential transfers, fraudulent transfers, and they've obtained a valid property interest under state law, the strong tradition in the code is that property interests are respected. They do pass through bankruptcy unimpaired. And it's fairly extraordinary to say that Congress here decided that once someone has obtained an actual property interest... Let me ask, because I'm having trouble putting that within the context of TriStar. Because TriStar lines up factually here. It was a conversion of essentially equity to debt through a judgment that was recorded. And the Ninth Circuit had no problem saying, no, the origin is through equity to debt. It is mandatorily subordinated. But, oh, they forgot to say it doesn't really matter because they had recorded the abstract. Your Honor, TriStar did not even purport to address this question. It wasn't raised by the parties. The Ninth Circuit really just engaged in a meaningless exercise, years of litigation, because everybody forgot that it was recorded. Absolutely not, Your Honor. And I think to suggest that TriStar had any inkling that means we're being subordinated under Section 510, even though they didn't say a word about it, is a pretty stark over-reading of that decision. But let me try to shift gears, because if I can't convince the panel that the plaintext supports us, even though I do really think it does, I can hopefully at least convince the panel that the Kahn decision applies and says that no part of this claim should have been subordinated. And this is not a simple sale of an equity interest. This was a downstream, independent, separate misappropriation of assets that were specifically designated for the creditor. And it's important to remember, too, that a giant portion of this judgment, the earlier settlement, $48.8 million, the only portion of that settlement that even Eliph himself, the debtor, thought was attributed to any sale of securities in the joint entities, was only $16.3 million. Where is that in the record? Where is that in the settlement agreement? If you look to page 47 of our opening brief, you can see that we showed where Eliph himself had conceded that fact. And at a minimum, remember, this was dispositive on summary judgment. So if there is, in fact, a factual dispute about which part of the payments were allocated to what part of the settlement agreement. Why is there an assumption that any part was allocated? I mean, Judge Smith was pretty clear here. It's a settlement. It's a settlement of a specified amount, and it had at least two components of it. That's enough. Well, Your Honor, I think that cuts in our favor. The bankruptcy court specifically recognized that the settlement was not exclusively for damages arising out of the purchase or sale of securities. It covered other items. So you're saying if there was anything that touched on anything else other than the purchase or sale for this instance, then the entirety of that could not arise. Well, no, Your Honor. Our point is actually that the most that could be subordinated is the portion of the claim that actually is attributable to damages arising from the purchase or sale of securities. And it would be very strange to say that you have a clear equity interest plus a clear non-equity interest, something that just is a third-party transaction with the debtor like a simple ordinary creditor, and say the entirety of the claim is subordinated simply because a sliver of it actually covered an equity interest. That's not what Section 510B says. Why would the right to receive distributions, why should the right to receive distributions on account of an equity interest be elevated to the level of a creditor claim? I mean, didn't all this, even the damages claims, ultimately stem from the ownership interest, the equity interest? No, absolutely not, Your Honor. This is a really critical point, and the trustee elides over this repeatedly in its brief. The majority of the damages here arose out of the general partnership. And partnership interests are not securities. It's not covered under Section 510. And it involved claims for misappropriation of assets, for fiduciary breach obligations. So the majority of the damages actually had nothing to do with the sale of the interest in the joint entities. And that was the point we were making. If you look to page 47 of our opening brief, you can see that at most $16.3 million of the $48.8 million settlement was actually attributable to anything to do with the security interest. The remainder was not. You're inside your three minutes. I'll just point that out to you. You're inside your three minutes if you wish to reserve. I do wish to reserve the balance of my time. Okay, thank you. Thank you. All right, Mr. O'Keefe, please go ahead. I believe that the Court is not buying this whole word manipulation relative to what the meaning of Section 510B is. It is crystal clear that Congress understood what the term claim means. We assume when we interpret statutes that Congress said what it means and meant what it said. In this particular case, we're arguing about the meaning of a defined term claim, which specifically states secured claims. So there is no statutory interpretation reason for this Court to say, well, I'm going to modify Section 510 to carve out an entire category of claims that's explicitly in there per the definition. Can I take you in a little different direction? I understand the arguments that Mr. Geiser is making, but why are they relevant as to the effect of the lien? It doesn't affect necessarily the right to subordination or the requirement to subordination under 510B. Really, what he's arguing is the effect of that. And what you have here is a misunderstanding of how the statute operates. The way I think of it is assume an apartment building and basically the legislator or plumber comes in and reroutes the pipes around the first floor. So for distribution purposes, it means essentially the flow of dollars flows to all other creditors other than equity, as it should, until they're paid in full. So all of his arguments, well, I have a lien or I don't have a lien, it doesn't really matter because Congress has made a determination that those dollars will flow around his position until all other claims are paid in full. The contention that the consideration involved in this equation was somehow applicable to something other than the equity interest is contrary to the record. This case came to us on a silver platter from a factual perspective. There were 10 years of litigation. We cite on pages 23 and 24 of our brief the serial admissions that this was a buyout of his interest in a business. He was equity, he acknowledges that fact. That was accepted in three court opinions before the California Superior Court and the Appellate Division. I want to stop you and go back to your plumber analogy because I think it's a good one. But let's suppose in this case, we don't know much about the overall condition of the case. Let's suppose it's a surplus case and the creditors get paid in full, there's still assets left for the debtor. Does Mr. Geiser's client have a lien on those assets that go back to the debtor if it's a surplus case? I would say yes because the operation of the statute simply says you have this bundle of payment rights, a part of which is a lien, and we're simply going to say with our legislative pen, you don't take until all of the other creditors are paid. Thereafter, you're in the 726 distribution priority. For example, if this case were dismissed tomorrow, he would still have a lien. When it says for distribution purposes, it's a construct within the bankruptcy universe, which Congress absolutely has the power to do. If you look at these, but to address his factual condition, when this case came to the Bankruptcy Court, and we told them this before they pushed Mr. Eliff in bankruptcy, that this was giving less on a silver platter, a 510B claim. The reality is he had admitted every single element of our case, not once but multiple times, and the contract is clear. The concept that, well, there was this general partnership, that's not what the record shows. Whenever you start a business and two people sit down to discuss what they're going to do, at that instant in time, there may be a general partnership. But they elected to operate their business, which was a real estate development business, through separate legal entities, all of which were LLCs. There is nothing in the record that validates their contention that there was this substantial amount of consideration that was payable for something other than those LLC interests. They're also ignoring the whole focus of 510B under Slane Kripke. The day he invested in the LLCs, that day, way, way back in 1990, he was deemed to be an equity holder. Everything thereafter under Slane Kripke doesn't matter. It doesn't matter. You can't climb up the balance sheet. Because you made an investment bargain that I want the upside profits, which, in fact, this individual received. In less than 10 years, he received a distribution on account of the purchase of his interest of $26 million. What he doesn't want to own is the other part of the Slane Kripke analysis, which is, I'm going to suffer in the event of an insolvency. And his claim is supposed to serve as a cushion under Slane Kripke. So what happened in this case is exactly what should have happened. The Conn case has no relevance to this case. Here, the settlement agreement was a buyout, again, per Mr. Curtin's own serial admissions of his equity interest. Designed into that contract was a limitation on distributions, which specifically ties out to the payment of the purchase price. So they got together, drafted a contract for the buyout, and they both understood the risk that there was a possibility distributions could be taken, leaving a shortfall. Under those conditions, what California spirit court said is Mr. Eliff had to make up that difference. And that's exactly what happened. He obtained a judgment for that, but it ties out per their own contract to the purchase price, the equity securities. And Conn, it would be as if someone broke into your house, stole your shares, which was in essence what happened. So the Nye circuit said this is not a risk that any buyer of securities would contemplate that. So there never was a circumstance where Conn had any application. I would say in this particular case, and again, this was in 30 years of practice, this was the case where someone handed me everything we needed, every single admission because of the 10 years that went on in litigation. I had three opinions. I had his testimony on the penalty of perjury. There were no disputed facts here. It was like a dump truck of evidence pulled up. You know, my wife watches these murder mysteries, the BBC murder mysteries, which last an hour. It would be as if 55 minutes were involved. Someone admitting all the facts of the murder in the last five minutes. He was trying to explain why. Well, I really didn't mean that. But the record was overwhelming. And Judge Smith gave Mr. Curtin every single opportunity to develop whatever evidence he wanted. And if you look at the record, all of the contentions that he states, well, I sold something of mine other than my equity securities. He was never able to establish that he sold anything. In fact, the one thing that he appointed to, which was the purported quick claim of the name Sunkel. We proved the negative. We went into court and said, not only does he have no evidence, we're going to introduce a declaration in Mr. Uliff that establishes that for the 20 year period before those entities came into existence, it was used by Mr. Uliff's father. Thereafter, it was used by the joint entities. So he never had an interest as the release of claims. The claims that he's talking about that were released as part of the settlement agreement are equity level claims. That was his relationship with Mr. Uliff. He wasn't involved in this as a creditor. He was involved as an equity level claimant. So even if you accept his contention, those claims are still subordinate. They're in the same basket. I would conclude by pointing out that when I look at this case, this case presents exactly how 510B is supposed to operate. In less than a 10 year period of time, Mr. Curtin received a payment for his securities of $26 million. He's here in this court because he wants the other $20 million, which he didn't get because of an insolvency event, which is why we're all here today. So the other creditors, because he's subordinated, will receive a distribution. And when he goes home tonight, he will still have his $26 million. So he will get the full benefit of the upside risk. What he doesn't want is the other part of slaying Kripke, which is to have his claim serve as a cushion so that the other people in this case can receive a distribution. Because if his claim is validated, he's the only one who receives anything. I have no, if the court has any questions. I'll ask, just ask the allocation. You are taking Judge Farris's point that there is a purchase of the equity interest and then there's damages. But those those damages are related to equity. Is that correct? That's exactly right. And at that point in time, when they entered the settlement, the litigation had just started. He'd filed a claim. They were litigating for a period of time, and then they entered into this equity buyout. But the only damages he could ever suffer as Eliff's co-owner were damages to his equity interest in the LLCs. That's where the value is. That's where all the properties are. Does it matter that they settled that? If they hadn't thought it through and settled it, would it be a different result? No, it would still be an equity level claim. The fact that it, under Slane Kripke, the concept is, and this is where they're just missing. I get the concept. My question is whether that, whether it adds anything to this, that they thought about it and they, you know, specifically settled it. And then themselves, therefore, tied it back to the equity. Is your thesis right? Yes, but also in a buyout of your equity interest. You're capturing that in the purchase price that's in this entire equation, that they're buying out his equity. That's my question. How much of this is contractual? How much of this is just, this is just the way it has to work? Well, I think it's both. I expect you do, but why? Well, no one would enter into a buyout of their partner's equity interest knowing the next day they would be involved in litigation over that exact equity interest. Because once he acquired the totality of Mr. Curtin's rights, he necessarily acquired with it all of those claims. So even if there had been no release, what would Mr. Curtin's standing be? The claims would be owned by Mr. Eliff. But when you draft these buyout agreements, there's a lot of belt and suspended provisions. And he's citing those saying, well, there's a, there's a mutual release. Well, there is in everybody. There is indemnities. There are going forward indemnities in everybody. Those are integral parts of the transaction. The name of the business, since Mr. Eliff was the surviving buyer, of course, the name would stay with the business. So there wasn't any, there wasn't like, for example, in the kid case that they cite were in the contract, the merger contract. They said, well, prior to the closing of this transaction, you're going to be taking over our facility. So you have to pay rent. That's clearly distinct from the equity issue. And so that was carved out. Or, for example, in the Betacom case, they sent it back down. They acknowledged that it was a 510B claim. But there just happened to be three small notes, which were totally separate and apart. And it wasn't clear from the record in the nice circuit what the source of that debt was. So they said, we're going to send it back down for that. That's not this case. This was a buyout of his equity interest. There is no attribute of that contract that doesn't drive that sale. There I go. Any further questions from the panel? No, thank you. All right. Thank you very much, Mr. O'Keefe. Back to you, Mr. Geiser, for a couple and a half minutes, I think, thereabouts. Go ahead, please. Thank you, Your Honor. I'll skip straight to whether 510B applies in the first place. First of all, I don't understand my friend's point that the prior admissions covered this. The Bankruptcy Court rejected that. And in the Bankruptcy Court's opinion, she reaffirmed repeatedly that the buyout was not solely for the purchase or sale of a security interest. The Bankruptcy Court recognized it was for other things, including buying out the rights to the trade name, including agreeing not to pursue employees of the partnership for a year, and including the settlement of tort claims that were related to conduct in the general partnership, not just the joint entities or not just any corporate security that 510B would cover. Let me cut to the chase and ask you, what case establishes that if it's both equity and damages, that does not constitute a sufficient nexus under Ninth Circuit law to impose 510B? I think the data column suggests that when you do have multiple claims and one may not be covered, then you have to distinguish and disaggregate the different components of the claim. How can you distinguish and disaggregate that if it is a unitary settlement? But Your Honor, it's a unitary settlement that covers many different points. That's your point. You had the choice at that time to divide that. You did not. It is just a settlement that under your view covers some equity, but a lot of damages claims that may or may not be attributable to equity because it's never really liquidated. Your Honor, let me put it this way. There's not a single case that I'm aware of that says that if you have a sliver of equity interests involved in a claim or settlement, then the entirety of the claim is subordinated. And I think that's contrary to the plain text of Section 510B. But it's not contrary to the Ninth Circuit law, which says if there is a nexus. Your Honor, but a nexus for what? It's a nexus for the claim for damages. But here you have a claim for damages that are not related to the purchase or sale of securities. Some of it might be, but the rest of it isn't. And if you want to look to Slane and Kripke and the purpose of Section 510B, there's no reason to subordinate a creditor's claim when an aspect of that claim, at least the entirety of the claim, I think hopefully we can agree on this. There's no reason to subordinate the aspects of the claim that are not related to the purchase and sale of security. When part of their claim is just indistinguishable from the claims of an ordinary creditor, there's no reason, they have no upside in the investment. No one's relying on an equity cushion. There's absolutely no basis for saying that part of the claim should be subordinated. Yet that was the ruling below. I'd also like to point out, this is exactly like Conn. Todd, Todd Curtin. I'm going to interrupt you just because your time's running. And I have a question I want to be clear on. You are asking on your point of appeal for us to rule that your client's lien is unaffected. Although the question before us really is subordination. No, Your Honor, we're trying to say that we're saying many things. We're saying, first of all, that liens aren't covered in 510B. We're saying that 510B doesn't apply in the first place. And we're saying, at a minimum, 510B doesn't apply to the entirety of the claim. And the bankruptcy court said, and I don't think the trustee, Your Honor, may I finish? Please do. Thank you. No one is suggesting that the liens are avoided. Everyone agrees the liens are still in place. That they're valid and they continue to exist. Depending what happens with the administration of the estate, yes. Well, Your Honor, but we think that to say, though, that the lien suddenly that attaches to specific assets no longer attaches to those assets is, in fact, saying the lien is invalid. I don't understand how that's preserving the lien at all. It preserves it to the extent that there's any value. But, Your Honor, but if it has, I don't know where it exists. It doesn't exist in the ether. It attaches to specific assets. And if the assets are sold, the lien then attaches to the proceeds. And if the proceeds are given to a creditor, they're not giving to the creditor free and clear. There are provisions in Chapter 11 and Chapter 13 for giving away assets free and clear of the lien, but with protections for the lien holder. This is not giving away the asset free and clear. Anything given away to any other creditor still comes with the lien attached to it unless the lien is invalid or set aside, which it is not. I will stop you at this point. So thank you very much for your arguments, both sides. The matter is submitted. Thank you very much. Thank you. Thank you.
judges: FARIS, LAFFERTY, SPRAKER